A. JANSSEN PHARM v. WATSON LABS 2012-1693 JANSSEN PHARM v. WATSON LABS Now to the most patient group of all who sit here for the entire proceeding this morning. Whenever you're ready, Mr. Green. Thank you, Your Honors, and good morning. This will change the topic somewhat. We're dealing with a combination of oral contraceptives. By way of background, and I know the Court is quite familiar with the background based on the extensive briefings, but to put the argument into perspective, there's a product called orthotricycline. That product was covered by a series of patents issued to Oroville going back to the application file in 1983. The patent ensued, the 815 patent, is a patent which was issued to cover the follow-up along product, orthotricycline low. The only difference between orthotricycline and orthotricycline low is the amount of estrogen used. In orthotricycline, you have 35 micrograms of estrogen. In orthotricycline low, 24. Can I interrupt on the anticipation argument? Absolutely. Because I understand, you know, we have some cases at clear value and others that suggest that a range is sufficient for anticipation. But I'm having a little problem here. We've got other cases like Adafino that seem to suggest otherwise. And in this case, if we were just talking about one range, this one range, and that was it, then I think I might agree that there are a finite number of ways you can go within that range. But it seems to me the patent disclosure has numerous ranges. It has numerous variables. So we are talking into the thousands or millions of potential variations. So it seems to me not to be a good fit for the cases that have been willing to accommodate that. So I'd like to hear your response. And that's a very good question, Your Honor. It goes right to the heart where the error occurred in the district court. And that is the view of that particular range. The case law from this court is absolutely clear. You go back to the Enric Graves case, which cites the briefs. And that case law says you don't stand back and look at a prior art disclosure or asking the question of anticipation from the standpoint of an individual walking down the sidewalk. It's supposed to be viewed from the position of a person of ordinary skill in the art. And that, in fact, was done in this case. And that view was expressed by Dr. Barnhart and not refuted by others, that the range in this case is a 20 to 50 microgram range of EE. And the district court went astray in its finding of no anticipation because it simply ignored the testimony by Dr. Barnhart, but the testimony of other law experts that said that range is a finite range. So you don't view that range. But there are numerous other variables within the claims, right? There are numerous variables within the claim, which also need to be viewed from the standpoint of a person of ordinary skill in the art. And, again, it's a combination error here. The first question is, what does that range mean? And the range of 20 to 50 clearly, as with unrebutted testimony, means 20, 25, 30, 35, 40, 45, 50. Dr. Barnhart testified that that range meant that. There is nothing in the record that contradicts that. Now the question is, and I'd say we've got a lot of cases that are thrown around here, but I would also direct the court back to the Enright-Graves case and its citation that Enright-Graves agrees. Because what does that case say? This is a CCPA case, as far as I know. It's not been overturned by this court. And it says, a reference anticipates a claim. If it discloses a claimed invention, such that a skilled artisan could take its teaching in combination with his own knowledge of the particular art and be in possession of the invention. That's a clear instruction to look at the entire reference that's being viewed from the standpoint of a person of ordinary skill in the art. And what do we have here? We have Example 4. Example 4. It's like in the 554 patent. Or 006 patent. Right. The same examples. We have Example 4. And again, not rebutted. Example 4 specifically covers ortho-tricycling. Claim 9 in the 006 patent specifically covers ortho-tricycling. Ortho-tricycling was, at the time, one of, if not the most successful combination of oral contraceptives ever. A person of ordinary skill in the art is aware of that. A person of ordinary skill in the art is going to read the 006 patent and recognize what Example 4 and Claim 9 is covering. How would a person of skill in the art know that it's 25 microliters? That's a desirable dosage in the 006 patent. The 006 patent gives a range, Your Honor. That's a really big range. I would submit that, based on the testimony in this case, it's really not that large. Yeah, but the district court, as Judge Rayna points out, seemed to be concerned that there was no express teaching of 25. There was no express teaching of a reduction by 10. Or 5. The reference itself did not say move in 5 microgram increments. But the testimony was not rebutted, Your Honor, at trial, that the only approved oral contraceptives, as of that time, in the United States, always moved or varied by 5 microgram increments. That was not rebutted. In the unrebutted testimony, Dr. Barnhart was of the same effect. It's not a wide range. It's really 20, 25, 30, 35, 40. Before your time runs out, could you move to the obviousness? It seems like a lot of the concerns that the district court had revolved around the cycle control and with regard to reasonable expectation of success or others. Can you respond to why, in your view, that's not relevant or not dispositive with respect to the obviousness concern? There are certainly several answers to that. First, reasonable expectation of success is to be directed towards a claim. The claim says nothing about cycle control. What the claim says is it's an oral contraceptive. It doesn't say anything about the cycle control benefits of that. But let's look at the record as to whether there really was such a concern. Well, there's some level of concern that there might be a change if there's a reduction in the amount of estrogen. One can say that there's a possibility that there might be a reduction. But there's also a possibility that there's not going to be a reduction because, and this actually goes back to the heart of one of the key issues in this case dealing with obviousness, and that's the expectation. The record had in it only information about a low dose of 20 micrograms. There was never in the history of oral contraceptives, as far as I know and certainly in the U.S., a product that contained 25 micrograms. The testimony from, and again, this was not rebutted, including Dr. Darning, one of the Oracle experts, was that he didn't know what to expect. And the inside testimony from Ortho, which is under protective order, we do quote in the brief, specifically addresses the question of the expectations of what would come from that, the amount of cycle control that would occur. And the expectation was they would have a successful oral contraceptive. And that's really the only question that's involved. And what was the motivation? The motivation? Estrogen, because of the bad side effects. I'd say it was multifactored. And much of the testimony came in through, again, Dr. Barnhart. The FDA said you should prescribe, to the clinicians, you should prescribe the lowest dose possible to the patients. The motivation to reduce was also a market motivation. And we have this in our brief. It's under the protective orders. I can't quote it directly. Where the market was clearly moving down with respect to the amount of estrogen. But isn't that motivation to decrease estrogen at least coupled with some sort of motivation or concern with regard to cycle control? The motivation to move down is to do away with the problems associated with it. But the concern was that there was a problem with breakthrough bleeding, that when you decrease the estrogen level, that creates the other concerns, right? There was a concern expressed based on the data that's in Table 4 in the past. It's 20 micrograms of ED. There's no data on 25 micrograms of ED. Even Dr. Pascual says in his book that if you lower the estrogen, you're facing a tradeoff. Isn't that what you've been teaching away? There is indeed the possibility that by moving to 25, there might have been a reduction in estrogen. But there again was no evidence that such would actually occur. And even if, following up on your question, even if it's a tradeoff, it doesn't then motivate one not to make the product. The motivation, in fact, was clearly there to make it even if there were some amount of reduction of cycle control as you lowered the amount of estrogen. The fact that a few additional women might potentially have a reduced amount of cycle control doesn't mean you then decide not to make a product where a vast majority of women are going to benefit by that lower amount. And again, the motivation is clear in the record. The FDA said move down. At that time, they probably taught that if you lowered the estrogen, you were going to cause further bleeding. I mean, how does that make commercial sense? The problem, I think, Your Honor, is it's not a unitary concept. It doesn't mean that if you reduce the estrogen, and in fact it does cause additional bleeding, it's going to affect all women. Well, is it also the case that the O6 patent says the purpose, which contains the wide range, says the purpose is to lower total monthly steroid dose while still obtaining equivalent bleeding patterns and protection against pregnancy? So that suggests that you could lower the dose without increasing bleeding patterns. Well, indeed, Your Honor, as I said, there is no evidence at all that by going to 25 you're going to have an adverse effect on the bleeding patterns. The evidence is if you go down to 20, that clearly took place. And there is no record testimony as to what would happen at 25 because there was no product that was at 25. That also couples with the issue of where is the unexpected results from the standpoint of how do you judge unexpected results? And this Court has found that unexpected results can only be viewed in terms of a difference from what was expected. And there is nothing in the record that tells you what to expect if you were going to move to a 25 microgram dosage from 35. Nothing. So there's no testimony that if you did that, that there would be cycle control problems. There is no evidence at all, Your Honor, that by moving to 25 there in fact will be. There's the concept of a threshold effect. You know that even today where that one is as to how much of a reduction you can encounter and have an actual reduction. And Dr. Barnhart again testified to that. There's been discussion as to a threshold effect. Where is there any proof as to where that threshold actually is? Was there some level of potential concern? Some concern. What was the expectation that you were going to have once you reduced from 35 to 25? You can't find that in the record. It doesn't exist. It doesn't exist because there was no data. And Dr. Darney said specifically in his testimony when I asked him, so what happens when you move from 20 to 25? He said, well, I don't know because there's no data on that. And without proof of the expectation that's to be shown to be unexpected, then when you move from 35 to 25 there cannot be a showing of unexpected results. On the topic of unexpected results, there are probably 10 different issues that we have with the unexpected results. And let me just start with the fact that there was no original expectation. The cross-study comparison data, this is a study comparison between data that was 10 years old and the more current data. It was not a head-to-head comparison. The FDA itself will not approve a product market approach from the standpoint of no difference with respect to breakthrough bleeding unless there's a head-to-head showing. There's a decision that was recently issued in Duramed at the district court level that actually says, well, then how can there be a showing of unexpected results in this case? There's no showing that would allow the marketing of the product with that argument that there was no change in the cycle control. The fact is that... You are certainly correct, Your Honor. Let me just conclude on that point. From the standpoint of the actual data that is shown in Table 5, even through the analysis done by Ortho, there was a difference that was shown. It wasn't the same. Three out of the first six cycles were shown to have worse cycle control. Thank you, Your Honor. Thank you. Since we asked you some questions, will we store two minutes of rebuttal time and keep things even? If Mr. Hafford needs it, we'll add two minutes to his time. All right. Thank you, Your Honor. Let me start, if I may, Your Honor, by orienting ourselves a bit in that Judge Chesler sat for a six-day, very lengthy trial, heard a substantial amount of evidence, most of which, as it turns out, was actually adduced by Jansen, even though Dupin had the burden of proof by clear and convincing evidence. But be that as it may, he made factual findings that support his judgment of no anticipation and no obviousness. And as this Court has held, that is reviewable only upon and overturnable only by a demonstration of clear error. And I start here because I think this informs the rest of my comments, because this Court has said clear error means that what the district judge decided, to quote Cahill v. Unilever, is implausible in light of the entire record, or where it chooses one of two permissible views of the evidence, that is acceptable. So I will now deal with the evidence. But I think what's important to do to set the stage is that there was ample evidence on every question Your Honors have asked and every point we asserted at the trial. Judge Chesler made factual findings, and this Court, although obviously this is ultimately a question of law, has said repeatedly that everything from what the prior art discloses to motivation to make the invention, to reasonable expectation of success, and unexpected results are factual findings. Well, let's turn then, as you suggest, to the findings. Okay, the district court made one finding that Lupin failed to demonstrate why a person skilled in the art would have looked to the 06 patent to create a lower-dose double-A. In my view, that question is irrelevant to the obviousness inquiry. Our case law doesn't require that a patent challenger identify a particular reason to choose a particular piece of art. This isn't a completely, entirely different field. And in fact, I think there is a clear reason why one would have looked to the 06 patent. So, you know, I know there are numerous findings upon which you can rest, but this is at least one where I had a bit of a problem. And your question, Your Honor, has to do with whether or not one would have started with the 06 patent. Yeah, well, they put the burden, it seems, the district court put the burden, it seems, on Lupin to demonstrate why a person skilled in the art would have looked to the 06 patent at all. And I don't know that that's a fair, you know... I think I can address that, Your Honor. That, I think what Judge Estler was referring to, is that's how Lupin chose to try the case. Lupin chose to attack the obviousness of the patent by citing the 006 patent. And indeed, that was pretty much the central point of their case. So, Lupin chose to focus the trial judge on the 006 patent and pitch their entire argument to the proposition that the 006 rendered the 851 patent that covers ortho, tricycle, and low, either anticipated or obviousness. So, I think, Your Honor, in fairness, I think that's what Judge Estler was indicating. And indeed, it might be interesting to note that, from the starting point, that this wasn't basically, by Lupin, a do-over. What I think was interesting that happened at the patent office is that the 006 was the patent focused on by the examiner. Indeed, Janssen's patent lawyer, when first receiving a rejection over the 554, the squally patent, said, no, Mr. Examiner, please, we think, Janssen thinks the 006 patent is the closest prior art, went on to distinguish over it by showing unexpected results and obtained patentability. The essence of the review of the entire record of Lupin's case is that the patent office was wrong and the 006 patent renders it anticipated or obvious. And, Your Honor, therefore, I think it would be helpful if I just review what we think is the critical evidence that supports the judge's findings on why there was no anticipation and also why there's no... Well, as long as you can make sure in that analysis that you include the question of unexpected results, simply because you raised it here. Yes. The reading of the patent is, this is for a contraceptive method and product. And the unexpected results analysis seems to be focused primarily, if not entirely, on this breakthrough bleeding problem, which is not something covered by the patent. I mean, there's contraception, there's a breakthrough bleeding issue, but it's not something that's claimed in your patent. So why is that relevant? Or, certainly, why is that dispositive of anything? Your Honor, I can answer that in multiple ways. First of all, this Court has held before that the inherent properties of a composition or even a method of using a particular product are part and parcel of the product, even though every invention, even though each and every element is claimed. In the Yamanishi case, they considered toxicity and other aspects of the composition, even though they weren't all named in the claim. But in addition, the 815 patent is an oral contraceptive patent. And the claim construction, et cetera, addressed the fact that it has to be contraceptively effective. And what the evidence at the trial showed is that if psychocontrol is problematic for the woman, what will happen is she will cease taking the oral contraceptive and thereby become pregnant, leading to a whole host of legal and ethical issues that she would then have to face. So whether or not a contraceptive is effective, which is what's claimed in the patent, is part and parcel of the invention, is the side effect of psychocontrol. And that was recognized by the Patent Office because indeed the patent was allowed by a showing of unexpected results in terms of the psychocontrol. And in terms of whether or not these results were unexpected, let me address that in two parts and respond to Mr. Green as well. The evidence is clear on the first prong of that, that orthotricycline low demonstrated substantially the same quality psychocontrol as orthotricycline, the 35 microgram pill. Indeed, Dr. Sarah Berger, their expert, admitted that. And as a result, the judge found that there was ample statistical evidence to support that based on Dr. Camus and Dr. Darney. In addition, let's talk about why the results were unexpected. Well, we know from all the evidence that was produced by us that there were teachings in the prior art that if you lowered estrogen by 10 micrograms, Akerlin and Endocrat taught by 10 micrograms, you would get poor psychocontrol. And we cite five prior art publications in our brief that all harken to that teaching of Akerlin and Endocrat So that's what the skilled artisan thought in 1998. If I take estrogen down 10 micrograms, I'm going to get poor psychocontrol, which will then defeat the entire purpose of the contraceptive. Now, Mr. Green suggested to your honors that there was no evidence that you would be concerned about that with 25. Wrong. Dr. Darney explained that a peseta, a person of ordinary skill with the art, would have looked at the experience with the 30 microgram to 20 microgram comparisons in Akerlin and Endocrat when forming an expectation about what would happen when reducing EE dosage from 35 to 25 micrograms. He further explained that a person of ordinary skill in the art would have expected the same relative decrease in psychocontrol with such a reduction. Appendix 13994, line 10 through 14004.8. So as a result, there was ample evidence, and in fact, that's what the prior art taught. And many authors subsequent to Akerlin and Endocrat agreed with that proposition. Moreover, there was a general teaching in the art at that time by many references, seven references that he cited. It was understood by all skilled artisans that if you lowered estrogen, you would get increases, problems, or poor psychocontrol. As an additional reason, what the prior art also taught, which their experts never addressed in the trial, these are triphasic regimens. And to your point earlier, Your Honor, about the question of anticipation, this is not an estrogen patent. The 815 is a combination of triphasic regimen patents with six variables, progestin, progestin dosage, estrogen, estrogen dosage, pill-free period, and number of days in the phases. And the Lupin argument ignores all of those elements of the patent because they don't help them, and they have no answer, and they want you to focus on estrogen only. But what's the prior art teach if you wanted to try to reduce estrogen? The prior art teaches you need to make compensatory changes, which means if you want to lower the estrogen, you need to increase the progestin. Their expert never addressed that. We have ample evidence that that's exactly what would happen. And indeed, proof in the marketplace. Dr. Sarah Berger first testified as their expert that, oh, there would have been no expectation, there was nothing out there. Then on cross-examination, I asked her about her service to Park Davis as a consultant before she was a hired expert in this case. On Mercet and Estrostep, 20-microgram pills, poor cycle control. And I compelled her with the evidence to admit that, in fact, as a result of the poor cycle control of the 20-microgram pills, first that it was acknowledged in the market that the cycle control was bad, and it was leading to discontinuation by women. So what do they do? Well, in one pill, they raised the amount of estrogen in subsequent phases. In another, in the other, they actually had the woman take the contraceptive for five of the seven days of the pill-free period. What does that teach us? What does that teach all skilled artists? If you want to touch one element of the regimen, you make compensatory changes somewhere else. That was totally ignored. Dr. Barnhart didn't admit it. Dr. Barnhart didn't even address it precisely. And in addition, what Dr. Barnhart did, and this is really the perniciousness, in my view, of what Lupin is attempting to do here. When Dr. Barnhart tried to limit the class, here's the game he played. He told Judge Shessler, well, I'm going to limit to one of seven dosages on estrogen. And when Judge asked him, well, what about 35 micrograms is the preferred dosage? He says, well, I'm going to ignore that. I'm just going to pick 25, even though the patent teaches that 35 is the preferred dosage. But when he wanted to limit the class, the range of possibilities, even though the patent says five to seven days pill-free period, he said, I'm just choosing seven. So we cross-examined them. Why? Why do you pick the preferred dosage and ignore the range? Didn't really have a good answer to that. But in fact, what he was doing, which obviously caused the judge to seriously question his credibility, is game-playing. You either accept the entire ranges, or you accept the preferred ranges, but you can't have it both ways. Now, back to the end. So, Your Honor, for all of those reasons, there was not only no motivation, but no expectation of success. I want to quote something else, because I'm not sure very many patents say that. You're saying, Mr. Epps, you could also say that these various ranges that are possible preclude the anticipation. They do. They do. And they do, Your Honor, because even though under our range cases, the 25 milligrams is shown. 25 milligrams, Your Honor, is within the range of 20 to 50. No question about that. However, the 815 patent is a regiment patent with six variables, which the undisputed testimony said each variable is interchangeable, is synergistically related to the others. Dr. Schulman testified that even making certain assumptions about the number of progestogen dosages, as well as the progestins and the estrogens, he had 841 million possibilities. If you calculated the class just using the preferences, so Dr. Schulman gave an alternate opinion. So Dr. Schulman was talking not about the 815, he was talking about the 006 test. Correct. Yes, Your Honor. The one that they claim anticipates 006. So Dr. Schulman tested it another way. He said, let's assume we just took the preference in each of the six, 1,126,638 possible regiments. Even if you were to just have the preference for the seven-day pill-free period, you still get 375,546 regiments. Now, Judge Schultz, your question, what the cases say is in order to have anticipation by a prior reference of a subsequent reference where a species is claimed, where the genus is disclosed, the skilled artisan, and this is pretty much well settled, at least last time I checked in this court, must immediately envisage a limited class and each member of that class. Our testimony was there was no limited class and a skilled artisan would not immediately envisage each member. Dr. Berger didn't even address it. And Dr. Barnhart never, ever identified the class. All his testimony to some substance was he just focused on the estrogen dosage and a bit of a nod to the pill-free period. But he never, for instance, answered and was never asked on direct examination, Dr. Barnhart, what is the size of the limited class taking into account the possible progestins, the possible progestin dosages, the possible estrogens, estrogen dosages and the pill-free period? In other words, a proper question when the prior reference was a six-part contraceptive regimen. Look at the titles of the 006. It's not the estrogen patent. It's oral contraceptive. That's what it is. That's the invention. So, Judge Berger, back to you. I think your first question to Mr. Green is the failure on anticipation is simply the inability to prove and it was their burden of clear and convincing evidence that there was a limited class and that the skilled artisan would immediately envision it's a limited class. Simply put, we've treated the patent properly with all the ranges that are disclosed in the 006. Boop and cherry picks and they actually expect you to accept the proposition that you would just look at one element of the range. Did Lupin try to manufacture in a limited class with 5-microgram increments? Yes. Your Honor, your first question was, your question is did Lupin... Did they manufacture, didn't they try to manufacture with a limited class of 5-microgram increments? Your Honor, I'm not aware whether they did or not. Your Honor, I see my time is running out. Let me say two things. One is, in this case, you have a rare occurrence. Dr. Samuel Pasquale, the inventor of the 006 and the 554 patents, had subsequent patents. He's a skilled, he's an extraordinary artisan. Oh, what's important, these patents were issued after the 554 and the 006. What did he teach the skilled artisan but before the 815? Teaching away. About his cycle, about his 777 regimen disclosed in the 554 and 0061, he said, quote, effective low-dose contraceptive regimen with ideal cycle control may be achieved by departing from the 777 regimens of the Pasquale patents and administering a low dose of steroids over at least 24 days. Your Honor, the subject of that, Your Honor, is Appendix 13883, line 16, through Appendix 13887, line 24, its garnish testimony regarding the Pasquale patent. And, Judge Raymond, in response to one of your questions, it's also disclosed at the 724 patent, A1472, another Pasquale patent, and it was subsequently reported in the birth control book. Now, lest there be any questions about how serious this would be, the Lawson article, which was testified to by Dr. Shulman, at A832 through A837, very important, was a study of nergestimate with a 0.125 dosage and 35 micrograms and then same amount of progesterone in 25 micrograms. You know what happens? Eight times more pregnancy with the 25 microgram dose than the 35. From 0.69 to 35 to 5.71. Can there be any doubt that a skilled artisan at that time would not have been motivated just to lower the estrogen from 35 to 25 when he had a prior art reference that says you will get eight times as many pregnancies? Simply, Your Honors, I'll conclude by saying this, and I think it's very important. Lupin bore the burden by clear and convincing and here to demonstrate clear error. You compare these briefs and what you see is there is a paucity of record sites in the Lupin briefs. The Janssen brief is loaded with them. Though he didn't bear the burden at all, the substantial weight of the evidence and the substantial amount of the evidence, not just from our experts, but from what prior art references from what all the leaders in the field believe, was that this was a remarkable invention. And I'll close with a quote from Dr. Michel. Dan Michel, out in California, who Dr. Berger recognized as, called him actually the king. He's probably the leading living authority on contraception. And he wrote about tricycline lows, OTC low was the exception to the general relationship between ethanol, estradiol, and cycle control, given that it had excellent cycle control at the lower dose of estrogen. That is the quintessential statement of non-obviousness. The leader in the field said OTC low is the exception to the rule. Because the rule was, if you take estrogen down, you're going to get lousy cycle control, women will quit taking the pill, and it doesn't work as contraceptive. He says it's the exception. They cited no evidence, no prior art that said that the cycle control wasn't as good as OTC, as ortho-tricyclic, and no prior art reference, can Lupin point to, that suggested that 25 micrograms, that a drop of 10 micrograms in that regimen, would achieve the unexpectedly good cycle control. Dear Bruton, if there was such motivation out there, where was the prior art? We have all the prior art, which says, don't you dare take it down 10 micrograms. For those reasons, Your Honor, we respectfully request that this court affirm Judge Tessler's ruling. Thank you. We respectfully thank you. Mr. Green, you started with two, and since Mr. Pappas went over some, we'll give you another three minutes. So you've got a total of 500, Your Honor. I appreciate that, Your Honor. Otherwise, I was going to need to talk extremely fast. So let me start with Lawson. The Lawson article was, it's not even relevant. It dealt with 125 micrograms of nergastamate, not 180, or 215, or 250, which is the issue here for the orthotricycline to orthotricycline low product. Not even relevant. With respect to Dr. Berger, the judge clearly got that wrong. If you read our brief at pages 42 to 43, and reply at page 23, her testimony was this. In her view, she's a practicing clinician. She's seen an innumerable number of patients. She doesn't think there's any difference among any of the oral contraceptives. She uses the orthotricycline. She uses the low ester in 120, even. It has 20 micrograms. She's used it for, I don't know, a decade or so. She's had cycle control. She's seen no clinical difference between 20, all the way up to the 35, whatever's in the marketplace today. So when she said she didn't see a difference clinically between orthotricycline and orthotricycline low, it's because she doesn't see a difference between any of them. So there's no unexpected result here. And that's where the lower court really, sorry, the district court went astray. Because in interpreting that to mean that was unexpected results was plain wrong. Her testimony is they're all the same. There is no difference in that case. Mr. Pappas started with the issue of what happened to PTO. What happened to PTO was ortho went directly for the showing of unexpected results. There was no argument that there was lack of motivation or some teaching away or any of the other arguments that have been made today. Not before the patent examiner. So it's not as though Lupin's position was already dealt with by the patent examiner. Those issues were never raised.  Lupin's position on the unexpected results today brings into the picture an enormous amount of information that the patent examiner did not have. Mr. Pappas said that, well, where's the data that shows that there was a difference? Again, it's an art brief. The Cremude data, he did a regression analysis. He found that actually there was a statistically significant difference between ortho tricycline and ortho tricycline low in three out of the first six cycles. Dr. Darney's testimony is those are the most critical cycles. We're just looking at the early cycles from the standpoint of discontinuation due to early bleeding. The comment with respect to Yamanuchi and that you need to look at the nexus that this Court has recognized between a product and its properties, again, has nothing to do with this case. That's a molecule patent. And I agree wholeheartedly the position of this Court when it comes to molecule patents is that the compound and its properties are inexorably intertwined. This is not a compound patent. This is about a regimen. A regimen that's explained in column one in about line 51. It's a difference from the prior art wherein the amount of estrogen is maintained over three phases whereas you have an increasing amount of progestin. That is a teaching across the entire spectrum of that patent. And that's why when you look at, and I do believe that the law actually looks at cases such as this with a physician through the eyes of a person of ordinary skill in the art, and there is some amount of rational thought that goes behind that. And the reason why this Court says look at it through the eyes of a person of ordinary skill in the art is so that you don't find a million possibilities What you find is one clear teaching in example four and in claim nine that there's a really good product out there and it's called orthotricycline. You want to find a species within a genus, there it is. It's right there. And what does one of ordinary skill in the art do looking at the state of the art wanting to look at lowering estrogen, which by the way the district court found at page 820 that a person of ordinary skill in the art wanted to create ortho-oc regimens with lower EE dosages. That was a finding by the district court. And I would also point you to the Grimes testimony from ortho at 86245 and 6267 with respect to lowering the estrogen dose where he said even if there's a problem potentially that there may be some lower cycle control yeah, we're moving forward that way because that's the way the market was headed. I see that my time is up. Your Honor, I appreciate you taking the time and putting it back into my time. Thank you. We thank both counsel.